**COHEN, WEISS AND SIMON LLP**
Michael S. Adler
Jonathan M. Cerrito
900 Third Avenue
New York, New York 10022
212-563-4100
madler@cwsny.com
jcerrito@cwsny.com

*Attorneys for Plaintiffs*

**BLANK ROME LLP**
A Pennsylvania LLP
Stephen M. Orlofsky
New Jersey Resident Partner
Natasha Romagnoli (admitted *pro hac vice*)
Kelly A. Jauregui
Michael C. Lupton (to be admitted *pro hac vice*)
300 Carnegie Center, Suite 220
Princeton, New Jersey 08540
609-750-2646
Stephen.Orlofsky@BlankRome.com
Natasha.Romagnoli@BlankRome.com
Kelly.Jauregui@BlankRome.com
Michael.Lupton@BlankRome.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------- x

DANIEL SILVERMAN and PETER MITCHELL,
as Trustees and Fiduciaries of the Allied Industries
Health Plan a/k/a Allied Industries Local 427 Health
Plan, and ANNE AHSANUDDIN and PETER
MITCHELL, as Trustees and Fiduciaries of the
Allied Industries Pension Plan a/k/a Allied
Industries Local 427 Pension Plan,

                         Plaintiffs,

              - against -

DOROTHY MCBRIDE, ALISON MCBRIDE a/k/a
ALLISON MCBRIDE a/k/a ALLISON MARIE,
MICHAEL MCBRIDE, JUSTINE ANNUCCI a/k/a
JUSTINE BONOMOLO, and NGM INSURANCE
COMPANY,

                         Defendants.

-------------------------------------------------------------- x

       :
       :
       :
       :
       :
       :
       :

**FIRST AMENDED COMPLAINT**

Case No.: 22-cv-07476-CCC-ESK

Plaintiffs Daniel Silverman and Peter Mitchell as Trustees and fiduciaries of the

Allied Industries Health Plan a/k/a Allied Industries Local 427 Health Plan (the "Welfare Fund")

and Anne Ahsanuddin and Peter Mitchell as Trustees and Fiduciaries of the Allied Industries

Pension Plan a/k/a Allied Industries Local 427 Pension Plan (the "Pension Fund," with the Welfare Fund, collectively, the "Funds"), by their attorneys Cohen, Weiss and Simon LLP and Blank Rome LLP, allege as follows:

## INTRODUCTION

1.    This is an action brought under the Employee Retirement Income Security Act ("ERISA"), contract, and common law.

2.    This action arises because of a series of fraudulent actions undertaken by Defendants Dorothy McBride, Allison McBride, Michael McBride, Justine Annucci also known as Justine Bonomolo (together, the "Fraud Defendants"), jointly and severally, in each of calendar years of 2015, 2016, 2017, 2018, and 2019 (the "Fraudulent Scheme").

3.    Specifically, Defendant Dorothy McBride utilized her position as Funds' Director to direct at least $2,100,128.00 in (a) unauthorized payroll to herself and other insiders including the remaining Fraud Defendants (all family members as detailed below); (b) unauthorized and inappropriate Welfare Fund benefit payments; (c) unauthorized and inappropriate Pension Fund benefit payments; (d) unauthorized credit card transactions for personal and related expenses; and (e) unauthorized administrative expenses.

4.    These actions and inactions taken by Defendant Dorothy McBride, aided and abetted by the remaining Fraud Defendants and co-conspirators, not only resulted in additional compensation to which the Fraud Defendants and others were not eligible for or entitled, but also illegally inflated welfare and pension benefit payment and entitlement for McBride and others.

5.    The Fraud Defendants' joint and individual actions violated the requirements set forth in the Funds' Trust Agreements, ERISA, federal and state common and statutory law.

6.      The Funds also bring this action against their fidelity insurer, NGM Insurance Company ("NGM"), who is obligated to provide coverage for the losses sustained by the Funds because of the Fraudulent Scheme.

7.      On or about October 3, 2014, NGM insured the Pension Fund under fidelity bond, number F-834801, with a $500,0000 per occurrence limit of liability and no aggregate limit of liability (the "2014 Pension Fund Bond").  A true and correct copy of the 2014 Pension Fund Bond is attached as Exhibit A.

8.      On or about October 1, 2018, NGM renewed and replaced the 2014 Pension Fund Bond.  Thereafter, for the period beginning on October 1, 2018, NGM insured the Pension Fund under fidelity bond, number F-834801, also with a $500,000 per occurrence limit of liability and no aggregate limit of liability (the "2018 Pension Fund Bond," and together with the 2014 Pension Fund Bond, the "Pension Fund Bonds").  A true and correct copy of the 2018 Pension Fund Bond is attached as Exhibit B.

9.      On or about October 2, 2014, NGM insured the Welfare Fund under fidelity bond, number F-834803-Y, with a $500,000 per occurrence limit of liability and no aggregate limit of liability (the "2014 Welfare Fund Bond"). A true and correct as copy of the 2014 Welfare Fund Bond is attached as Exhibit C.

10.     On or about October 1, 2018, NGM renewed and replaced the 2014 Welfare Fund Bond.  Thereafter, for the period beginning on October 1, 2018, NGM insured the Welfare Fund under fidelity bond, number F-834803-Y, also with a $500,000 per occurrence limit of liability and no aggregate limit of liability. (the "2018 Welfare Fund Bond," together with the 2014 Welfare Fund Bond, the "Welfare Fund Bonds," and collectively, the Pension

Fund Bonds and the Welfare Fund Bonds are referred to herein as the "Bonds"). A true and correct copy of the 2018 Welfare Fund Bond is attached as Exhibit D.

11.    The Funds' losses sustained in connection with the Fraudulent Scheme (the "Losses") are covered by the Bonds, and NGM is obligated to pay those Losses, up to the limits of liability of the Bonds.

12.    The Funds have performed all the acts necessary under the Bonds, including but not limited to, payment of premiums and notice of claims. All conditions to NGM's performance have been satisfied or performed by the Funds or their performance is or has been waived or excused by the conduct of NGM or by operation of law.

13.    In breach of the Bonds, NGM has denied coverage and unlawfully attempted to rescind the Bonds because it contends that Dorothy McBride misrepresented in the October 2014 applications for the Bonds that the Funds had not sustained losses as a result of dishonesty during the prior 6 years.

14.    Upon information and belief, the Funds did not sustain losses arising from the Fraudulent Scheme until 2015, after the applications for the Bonds were signed.

15.    Further, Dorothy McBride, in perpetrating the Fraudulent Scheme, was clearly acting in her own interest, adverse to the interest of the Funds.

16.    While NGM contends that the Funds sustained losses prior to when the applications were signed, and that Dorothy McBride misrepresented her knowledge of such prior losses, any such alleged misrepresentation cannot be imputed to the Funds.

17.    Accordingly, the Funds seek a declaration that NGM has wrongfully denied coverage and must provide coverage for the Losses under the Bonds, up to the limits of liability.

**JURISDICTION AND VENUE**

18.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 29 U.S.C. §§1104, 1106, and 1109.

19.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

20.    Venue lies in this district under 29 U.S.C. §§1104, 1106, and 1109, as the Funds maintained their principal office in this district during all times relevant to this First Amended Complaint, namely, the period in which actions taken by the Defendants resulted in the harm reflected in the various causes of action filed against them.

**PLAINTIFFS**

21.    Plaintiffs Daniel Silverman and Peter Mitchell are Trustees and Fiduciaries of the Welfare Fund within the meaning of 29 U.S.C. §1002(21)(A), as they have discretion and control over the assets and administration of the Welfare Fund.

22.    Plaintiffs Anne Ahsanuddin and Peter Mitchell are Trustees and Fiduciaries of the Pension Fund within the meaning of 29 U.S.C. §1002(21)(A), as they have discretion and control over the assets and administration of the Pension Fund.

23.    The Welfare Fund is a "employee benefit plan" and "multiemployer plan" within the meaning of 29 U.S.C. §1002(3) and §1002(37), with its principal place of business currently at 420 West 45th Street, Fifth Floor, New York, New York 10036.

24.    During the years 2015 through 2019, and at additional times relevant to this First Amended Complaint, the Welfare Fund's principal place of business was located at 155 Changebridge Road, Montville, New Jersey 07045.

25.    The Pension Fund is a "employee benefit plan" and "multiemployer plan" within the meaning of 29 U.S.C. §1002(3) and §1002(37), with its current principal place of business at 253 West 35th Street, Suite 1200, New York, New York 10001.

26.     During the years 2015 through 2019, and at additional times relevant to this First Amended Complaint, the Pension Fund's principal place of business was located at 155 Changebridge Road, Montville, New Jersey 07045.

27.     The Welfare Fund was established to provide health benefits to eligible employees of the employers who participate in the Welfare Fund.

28.     The Welfare Fund is a collectively bargained, jointly-trusteed, multiemployer plan organized and operating pursuant to ERISA and administered in New York County.

29.     The Pension Fund was established to provide retirement benefits to eligible employees of the employers who participate in the Pension Fund.

30.     The Pension Fund is a collectively bargained, jointly-trusteed, multiemployer plan organized and operating pursuant to ERISA and administered in New York County.

## FRAUD DEFENDANTS AND CO-CONSPIRATORS

31.     Defendant Dorothy McBride was, at times relevant to this First Amended Complaint, the Fund Director of the Welfare Fund.

32.     Defendant Dorothy McBride was, at times relevant to this First Amended Complaint, a fiduciary of the Welfare Fund.

33.     Defendant Dorothy McBride was, at times relevant to this First Amended Complaint, the Fund Director of the Pension Fund.

34.     Defendant Dorothy McBride was, at times relevant to this First Amended Complaint, a fiduciary of the Pension Fund.

35.     On or about January 15, 2021, Defendant Dorothy McBride was criminally charged with embezzlement of funds from benefit plans that she oversaw and had

control over, including upon information and belief, the Funds. *See USA v. McBride*, Case No. 2:21-mj-09051-CLW-1 (D.N.J.).

36.     Based on the case docket, as of the date of this First Amended Complaint's filing, the criminal action against Defendant McBride remains pending.

37.     Upon information and belief, Defendant Alison McBride a/k/a Allison McBride a/k/a Allison Marie ("Alison McBride") is Defendant Dorothy McBride's niece.

38.     Upon information and belief, Defendant Alison McBride's father was Robert Michaels a/k/a Robert McBride ("Robert McBride").

39.     Upon information and belief, Defendant Dorothy McBride's brother was Robert McBride.

40.     Robert McBride died in 2018.

41.     Upon information and belief, Defendant Michael McBride is Defendant Dorothy McBride's son or nephew.

42.     Upon information and belief, Defendant Michael McBride was Robert McBride's nephew.

43.     Upon information and belief, Defendant Justine Annucci a/k/a Justine Bonomolo ("Justine Annucci Bonomolo") is Defendant Dorothy McBride's daughter, step-daughter, niece, or other close family relation.

44.     Upon information and belief, insider and co-conspirator Alexander Antoniades is Dorothy McBride's brother, stepbrother, or other close family relation.

45.     Upon information and belief, Alexander Antoniades is in prison due to a murder conviction.

46.     Upon information and belief, insider and co-conspirator Sebastian Bonomolo is Defendant Justine Annucci Bonomolo's brother, son, or other close family relation.

47.     Upon information and belief, insider and co-conspirator Sebastian Bonomolo is related to Defendant Dorothy McBride.

48.     Upon information and belief, insider and co-conspirator Ruby Winston was a friend and/or relative of Defendant Dorothy McBride.

49.     Insider and co-conspirator Ruby Winston died in 2016.

## **INSURER DEFENDANT**

50.     Upon information and belief, Defendant NGM Insurance Company is a corporation organized under the laws of Florida, with its principal place of business in Jacksonville, Florida.

51.     NGM is licensed to and does engage in the business of selling and issuing surety and fidelity bonds in New Jersey.

## **FACTUAL BASIS FOR CLAIMS**

Payment of Salary

52.     At all times relevant to this First Amended Complaint through her termination date on July 11, 2018, Defendant Dorothy McBride received bi-weekly her compensation from the Welfare Fund for the total amount of her salary as Fund Director of both the Welfare Fund and the Pension Fund.

53.     At all times relevant to this First Amended Complaint through her termination date on July 11, 2018, the total salary Defendant Dorothy McBride received by paycheck as Fund Director of the Welfare Fund and the Pension Fund was allocated between the Welfare Fund and the Pension Fund.

The Termination of Defendant Dorothy McBride's Employment

54.    Defendant Dorothy McBride's employment as Director of the Funds terminated on July 11, 2018.

The Welfare Fund Trust Agreement

55.    At all times material to this action, the Welfare Fund was maintained pursuant to an Amended and Restated Agreement and Declaration of Trust (the "Welfare Fund Trust Agreement").

56.    Article V, Section 2(d) of the Welfare Fund Trust Agreement provides, in relevant part:

> The Board of Trustees shall have the right to appoint or designate an Administrator or Executive Director who shall have such authority as may be delegated by the Trustees to supervise and direct the activities of the Plan. In no event may the Trustees delegate any function or policy making decisions which are the direct statutory functions of the Trustees. The salary of such Administrator or Executive Director shall be fixed by the Trustees and such person shall at all times be directly responsible to the Trustees.

57.    Defendant Dorothy McBride's pay by the Welfare Fund was set in July 2013 and was not increased thereafter by the Board of Trustees of the Welfare Fund.

The Pension Fund Trust Agreement

58.    For all times material to this action, the Pension Fund was maintained pursuant to an Amended and Restated Agreement and Declaration of Trust (The "Pension Fund Trust Agreement").

59.    Section 14.3 of the Pension Fund Trust Agreement provides, in relevant part:

> The Trustees shall appoint an Administrator who shall be responsible for the administration of the Plan subject to the direction of the Trustees, and who shall maintain accounts and

records reflecting the administration of the Plan. Furthermore, the Administrator shall be responsible for furnishing such information as is necessary to the Trustees and to employees covered by the Plan and Contributing Employers. The accounts and records of the Administrator shall be subject to examination at any reasonable time by any Trustee, and each eligible employee shall be entitled to examine at any reasonable time any such record directly pertaining to him. The Trustees shall designate an enrolled actuary to make all actuarial calculations required in connection with the Plan. With respect to all actuarial matters, the actuary's decision shall be final and binding.

Fraud Defendants' Misappropriation of Funds' Assets for Personal Gain

60.    Defendant Dorothy McBride's salary as Funds' Manager from 2015 through her termination in 2018 was $179,627.00 per year, payable in twenty-six (26) bi-weekly installments of $6,908.75.

61.    At no time thereafter relevant to this action did the full Board of Trustees of the Welfare Fund authorize any increase in Defendant Dorothy McBride's salary from that authorized in July 2013.

62.    At no time relevant to this action did the Board of Trustees of the Welfare Fund authorize bonuses or additional pay to McBride.

63.    McBride's pay by the Pension Fund was set in July 2013 and was not increased thereafter by the Board of Trustees of the Pension Fund.

64.    At no time thereafter relevant to this action did the full Board of Trustees of the Pension Fund authorize any increase in Defendant Dorothy McBride's salary from that authorized in July 2013.

65.    Upon information and belief, at no time relevant to this action did the Board of Trustees of the Pension Fund authorize bonuses or additional pay to McBride.

66.     In 2018, Defendant Dorothy McBride received fourteen (14) bi-weekly payments in the amount of $6,908.75 covering her employment for that year through her termination date of July 11, 2018.

67.     From 2015 through 2018, Defendant Dorothy McBride implemented an increase in her salary without notice to the full Board of Trustees of the Welfare Fund.

68.     From 2015 through 2018, Defendant Dorothy McBride implemented an increase in her salary without notice to the full Board of Trustees of the Pension Fund.

69.     In 2015, Defendant Dorothy McBride caused to be paid to herself $62,158.00 in additional payroll, for eighteen (18) additional weeks of pay, without notice to and/or permission of the Boards of Trustees of the Funds.

70.     Defendant Dorothy McBride has not reimbursed the Funds for $62,158.00 in 2015 misappropriated Funds' assets.

71.     In 2016, Defendant Dorothy McBride caused to be paid to herself $69,087.00 in additional payroll, for twenty (20) additional weeks of pay, without notice to and/or permission of the Boards of Trustees of the Funds.

72.     Defendant Dorothy McBride has not reimbursed the Funds for $69,087.00 in 2016 misappropriated Funds' assets.

73.     In 2017, Defendant Dorothy McBride caused to be paid to herself $75,542.00 in additional payroll, for twenty-one (21) additional weeks of pay, without notice to and/or permission of the Boards of Trustees of the Funds.

74.     Defendant Dorothy McBride has not reimbursed the Funds for $75,542.00 in 2017 misappropriated Funds' assets.

75.     In 2018, Defendant Dorothy McBride caused to be paid to herself $51,815.00 in additional payroll, for fifteen (15) additional weeks of pay, without notice to and/or permission of the Boards of Trustees of the Funds.

76.     Defendant Dorothy McBride has not reimbursed the Funds for $51,815.00 in 2018 misappropriated Funds' assets.

77.     Consequently, Defendant Dorothy McBride has misappropriated $262,531.00 in Funds' assets for personal gain, without required Board of Trustee authorization.

78.     Upon information and belief, without notice and/or authorizations of the Funds' Boards of Trustees, Defendant Dorothy McBride placed Defendant Alison McBride on the Funds' payroll for six (6) weeks in 2016.

79.     Upon information and belief, there is no documentation evidencing that Defendant Alison McBride was employed by the Welfare Fund and/or the Pension Fund at any point relevant to this action, including in 2016.

80.     Upon information and belief, Defendant Dorothy McBride did so illegally misappropriate Funds' assets through wrongful payment to Defendant Alison McBride.

81.     Upon information and belief, Defendant Alison McBride was complicit, and aided and abetted Defendant Dorothy McBride's misappropriation of Funds' assets through the wrongful inclusion of Defendant Alison McBride on the Funds' payroll.

82.     Upon information and belief, Defendant Dorothy McBride caused $4,554.00 in wages during six (6) weeks in 2016 ($759.00 per week) to be paid to Defendant Alison McBride in 2016.

83.    Upon information and belief, Defendant Alison McBride accepted $4,554.00 in Funds' wages during six (6) weeks in 2016 ($759.00 per week) despite knowledge that she was not entitled to said wages, as she was not a Funds' employee.

84.    Upon information and belief, Defendant Alison McBride should not have been paid $4,554.00 in wages in 2016 as she did not perform work for the Funds during the six (6) weeks in 2016 for which wages were caused to be paid by Defendant Dorothy McBride to Defendant Alison McBride.

85.    Upon information and belief, Defendant Alison McBride committed fraud on the Funds by knowingly and willingly accepting $4,554.00 in Funds' wages during six (6) weeks in 2016 ($759.00 per week) despite knowledge that she was not entitled to said wages, as she was not a Funds' employee.

86.    Consequently, Defendants Dorothy McBride and Alison McBride, jointly and severally, misappropriated $4,554.00 in Funds' assets for personal gain, without required Board of Trustee authorization and should be required to reimburse the Funds for said amount.

Wrongful Welfare Fund/RX Payments

87.    Upon information and belief, between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of at least $76,971.00 in unauthorized Welfare Fund healthcare and RX benefits to and/or on behalf of relatives and/or friends, despite said individuals not being entitled to payment of said benefits to and/or on their behalf.

88.    Between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $1,393.00 in RX benefits to and/or on behalf of Defendant Justine Annucci Bonomolo.

- 13 -

89.    Upon information and belief, as Defendant Justine Annucci Bonomolo has no work history or other such basis entitling her to said benefit, authorization by Defendant Dorothy McBride was knowingly wrongful and intended to defraud the Welfare Fund.

90.    Upon information and belief, Defendant Justine Annucci Bonomolo was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $1,393.00 in RX benefits paid out to her and/or on her behalf.

91.    Upon information and belief, Defendant Justine Annucci Bonomolo accepted the payment and/or allowed it to be paid to others with full knowledge that she was not entitled to any such payment to be made to her and/or on her behalf.

92.    Between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $131.00 in health benefits to and/or on behalf of insider and co-conspirator Sebastian Bonomolo.

93.    Upon information and belief, as insider and co-conspirator Sebastian Bonomolo has no work history or other such basis entitling him to said benefit, authorization by Defendant Dorothy McBride was knowingly wrongful and intended to defraud the Welfare Fund.

94.    Upon information and belief, insider and co-conspirator Sebastian Bonomolo was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $131.00 in RX benefits paid to him and/or on his behalf.

95.    Upon information and belief, insider and co-conspirator Sebastian Bonomolo accepted the payment and/or allowed it to be paid to others with full knowledge that he was not entitled to any such payment to be made to him and/or on his behalf.

96.    Between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $854.00 in health benefits to and/or on behalf of insider and co-conspirator Robert McBride.

97.    Upon information and belief, as insider and co-conspirator Robert McBride has no work history or other such basis entitling him to said benefit, authorization by Defendant Dorothy McBride was knowingly wrongful and intended to defraud the Welfare Fund.

98.    Upon information and belief, insider and co-conspirator Robert McBride was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $854.00 in RX benefits paid to him and/or on his behalf.

99.    Upon information and belief, insider and co-conspirator Robert McBride accepted the payment and/or allowed it to be paid to others with full knowledge that he was not entitled to any such payment to be made to him and/or on his behalf.

100.    Between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $64,513.00 in RX benefits to and/or on behalf of insider and co-conspirator Robert McBride.

101.    Upon information and belief, as insider and co-conspirator Robert McBride has no work history or other such basis entitling him to said benefit, authorization by Defendant Dorothy McBride was knowingly wrongful and intended to defraud the Welfare Fund.

102.    Upon information and belief, insider and co-conspirator Robert McBride was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $64,513.00 in health benefits paid to him and/or on his behalf.

103.    Upon information and belief, insider and co-conspirator Robert McBride accepted the payment and/or allowed it to be paid to others with full knowledge that he was not entitled to any such payment to be made to him and/or on his behalf.

104.    Between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the authorization of wrongful payment of $7,029.00 in health benefits to and/or on behalf of insider and co-conspirator Ruby Winston.

105.    Upon information and belief, as insider and co-conspirator Ruby Winston has no work history or other such basis entitling her to said benefit, authorization by Defendant Dorothy McBride was knowingly wrongful and intended to defraud the Welfare Fund.

106.    Upon information and belief, insider and co-conspirator Ruby Winston was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $7,029.00 in health benefits paid to her and/or on her behalf.

107.    Upon information and belief, insider and co-conspirator Ruby Winston accepted the payment and/or allowed it to be paid to others with full knowledge that she was not entitled to any such payment to be made to her and/or on her behalf.

108.    Between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $3,051.00 in RX benefits to and/or on behalf of insider and co-conspirator Ruby Winston.

109.    Upon information and belief, as insider and co-conspirator Ruby Winston has no work history or other such basis entitling her to said benefit, authorization by Defendant Dorothy McBride was knowingly wrongful and intended to defraud the Welfare Fund.

110.    Upon information and belief, insider and co-conspirator Ruby Winston was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $3,051.00 in RX benefits paid to her and/or on her behalf.

111.    Upon information and belief, insider and co-conspirator Ruby Winston accepted the payment and/or allowed it to be paid to others with full knowledge that she was not entitled to any such payment to be made to her and/or on her behalf.

<u>Wrongful Medical Payments Paid Out by the Welfare Fund Office</u>

112.    Pursuant to Welfare Fund policy, at all times relevant to this action, a third-party administrator was delegated with the sole authority and responsibility to remit payment for medical services performed by third-parties for and/or on behalf of covered participants and beneficiaries.

113.    At all times relevant to this action, the Welfare Fund Office was not delegated with authority to nor responsible for or authorized to directly remit payment to third parties for medical services performed by third-parties for and/or on behalf of covered participants and beneficiaries.

114.    At all times relevant to this action, neither the Welfare Fund's third-party administrator nor the Welfare Fund Office were ever delegated authority to remit payment to third parties for medical services performed by third-parties for and/or on behalf of non-covered individuals.

115.    Despite this, between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to direct payment by the Welfare Fund Office of $158,750.00 in unauthorized non-covered claims submitted by and/or on behalf of herself, her family, friends and/or other such acquaintances, likely including but not limited to the Fraud Defendants.

116.    Upon information and belief, Defendant Dorothy McBride knowingly did so to avoid said payments being denied by the Welfare Fund's third-party administrator due to lack of coverage and as for personal and familial gain.

117.    Consequently, Defendant Dorothy McBride is obligated to reimburse the Welfare Fund for $158,750.00 in unauthorized non-covered claims submitted by and/or on behalf of herself, her family, friends and/or other such acquaintances, likely including but not limited to the Fraud Defendants.

Wrongful Death Benefit Payments

118.    Upon information and belief, in 2017, Defendant Dorothy McBride wrongfully authorized a $5,000.00 Welfare Fund death benefit payment to Bobbie Clary, resulting from the death of insider and co-conspirator Ruby Winston, on whose behalf such payment was not authorized by the Welfare Fund.

119.    Upon information and belief, Bobbie Clary was and/or remains a fiduciary in the probate estate of insider and co-conspirator Ruby Winston.

120.    Upon information and belief, in 2018, Defendant Dorothy McBride wrongfully authorized a $50,000.00 Welfare Fund death benefit payment to Defendant Justine Annucci Bonomolo, resulting from the death of insider and co-conspirator Robert McBride, on whose behalf such payment was not authorized by the Welfare Fund.

121.    Upon information and belief, Defendant Justine Annucci Bonomolo was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $50,000.00 in death benefits paid out to her and/or on her behalf.

122.    Upon information and belief, Defendant Justine Annucci Bonomolo accepted the $50,000.00 death benefit payment with full knowledge that she was not entitled to any such payment to be made to her.

- 18 -

123.    Upon information and belief, in 2018, Defendant Dorothy McBride wrongfully authorized a $50,000.00 Welfare Fund death benefit payment to Defendant Michael McBride, resulting from the death of insider and co-conspirator Robert McBride, on whose behalf such payment was not authorized by the Welfare Fund.

124.    Upon information and belief, Defendant Michael McBride was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $50,000.00 in death benefits paid out to him and/or on his behalf.

125.    Upon information and belief, Defendant Michael McBride accepted the $50,000.00 death benefit payment with full knowledge that he was not entitled to any such payment to be made to him.

126.    Consequently, Defendants Dorothy McBride, Justine Annucci McBride, and Michael McBride are obligated to reimburse the Welfare Funds for the wrongfully paid out death benefits in the following sums:  Defendant Dorothy McBride $105,000.00, of which Defendant Justine Annucci McBride is jointly and severally liable for $50,000.00 and Defendant Michael McBride is jointly and severally liable for $50,000.00.

Inflated Pension Fund Retirement Benefits

127.    Defendant Dorothy McBride submitted a Retirement Declaration to the Pension Fund, dated April 17, 2015, requesting retirement benefits.

128.    Under the Plan's governing document:

> Effective October 1, 2014, a Member who *retires* from covered Employment on or after the attainment of age 62, who has at least 30 years of contributions made to the Plan on his behalf, may elect to receive his pension in a single lump sum distribution, equal to the actuarial equivalent of his normal or early pension payable under a life annuity form of payment.

129.    Defendant Dorothy McBride was not retired from employment at the time of the distribution in June 2015.

130.    In fact, Defendant Dorothy McBride did not separate from employment with the Plan until on or about July 11, 2018.

131.    Defendant McBride was not eligible for a lump-sum retirement benefit because she did not meet the terms of the Plan document.

132.    Despite failing to meet the terms of the Plan document, between 2015 and 2019 Defendant Dorothy McBride received $668,446.00 in Pension Fund benefits to which she is not rightfully entitled.

133.    Defendant Dorothy McBride is continuing to receive Pension Fund benefits to which she is not rightfully entitled.

134.    Consequently, Defendant Dorothy McBride is obligated to reimburse the Pension Fund for all retirement benefit payments for which she is not entitled.

Wrongfully Paid Disability Benefits

135.    Upon information and belief, between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $97,343.00 in wrongful disability payments to and/or on behalf of insider and co-conspirator Alexander Antoniades, despite knowing that he was not entitled to said benefit.

136.    Upon information and belief, insider and co-conspirator Alexander Antoniades was complicit, and aided and abetted Defendant Dorothy McBride's authorization of $97,343.00 in wrongful disability payments paid out to him and/or on his behalf.

137.    Upon information and belief, insider and co-conspirator Alexander Antoniades accepted the payment with full knowledge that he was not entitled to any such payment to be made to him and/or on his behalf.

138.    Consequently, Defendant Dorothy McBride is obligated to reimburse the Pension Fund for all wrongful disability benefit payments authorized by her to friends/relatives, including insider and co-conspirator Alexander Antoniades.

Unauthorized American Express Charges

139.    Upon information and belief, between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of $145,042.00 in American Express charges by the Welfare Fund and $176,285.00 in American Express charges by the Pension Fund.

140.    Upon information and belief, the referenced American Express charges paid by the Funds, and likely other such and/or similar charges paid by the Funds, were for personal benefit and not because of work performed for the Funds and/or expenditures incurred by the Funds.

141.    Upon information and belief, as all credit card records are not available and/or were not preserved by the Fraud Defendants at the Funds' Offices, there may be additional credit card charges wrongfully authorized by Defendant McBride during her employment with the Funds.

142.    Consequently, Defendant Dorothy McBride is obligated to reimburse the Funds for at least $321,327.00 in unauthorized 2015 through 2019 wrongful credit card charges.

Unauthorized Administrative Expenses

143.    Upon information and belief, between 2015 and 2019, Defendant Dorothy McBride directed, authorized, and/or took actions that led to the wrongful authorization of payment of at least $405,206.00 in unauthorized administrative expenses for personal benefit for which insufficient and/or no documentation is available justifying said charges to the Funds.

144.    Upon information and belief, the undocumented administrative expenses charges were for personal benefit and not because of work performed for the Funds and/or expenditures incurred by the Funds.

145.    Upon information and belief, as all administrative charge records are not available and/or were not preserved at the Funds' Offices by the Fraud Defendants, there may be additional administrative charges wrongfully authorized by Defendant McBride during her employment with the Funds.

146.    Consequently, Defendant Dorothy McBride is obligated to reimburse the Funds for at least $405,206.00 in unauthorized 2015 through 2019 administrative expenses.

Other Amounts

147.    Upon information and belief, Fraud Defendants, jointly and severally, may have and/or may continue to misappropriate other Funds' assets to themselves and others by and through their joint and several actions and inactions, including but not limited to wrongful payment of additional salary, benefits, and/or other such payments and expenses.

148.    On information and belief, additional amounts will become due and owing and/or will be found due and owing to the Funds by the Fraud Defendants, jointly and severally, during the pendency of this action.

Coverage Dispute

149.    At all relevant times, NGM insured the Funds under the Bonds.

150.    At all relevant times, Dorothy McBride was the Fund Director of the Funds and was an "Employee" of the Funds and a "Covered person" within the meaning of the Bonds.

151.    On June 11, 2019 and July 23, 2019, the Funds provided NGM with notice of the Fraudulent Scheme under the Bonds.

- 22 -

152.    The Funds timely asserted the claims under the Bonds.

153.    On October 2, 2019, the Funds provided a Proof of Loss and supporting documentation for the losses incurred by the Pension Fund in connection with the Fraudulent Scheme.

154.    On November 8, 2019, the Funds provided a Proof of Loss and supporting documentation for the losses incurred by the Welfare Fund in connection with the Fraudulent Scheme.

155.    By letter dated October 14, 2022, NGM wrongfully attempted to rescind the Bonds.  NGM contends that Dorothy McBride obtained unauthorized bonus payments prior to October 2014.  Dorothy McBride allegedly signed the applications for the Bonds in October 2014 and misrepresented, among other things, that the Funds had not suffered any dishonesty losses during the past 6 years.

156.    The Bonds specifically insure loss of "Money" or "Securities" resulting directly from "Employee Theft."

157.    The losses sustained by the Funds in connection with the Fraudulent Scheme constitute the loss of "Money" arising from "Employee Theft" and "**fraud or dishonesty** committed by a **covered person**" within the meaning of the Bonds.

158.    Upon information and belief, the Funds did not sustain any losses arising from the Fraudulent Scheme prior to 2015.

159.    Even if the Funds did sustain losses arising from the Fraudulent Scheme prior to 2015, in denying her own fraud on the applications, Dorothy McBride was clearly acting in her own interest, and against the interest of the Funds.

160.    Any alleged misrepresentations in the applications for the Bonds cannot be imputed to the Funds as a matter of law.

161.    Under applicable law, NGM may not rescind the Bonds.

162.    To date, NGM has failed to pay the claims and has indicated its intent to rely upon the attempted rescission of the Bonds as a defense to said claims.

163.    An actual controversy exists between the Funds and NGM as to the rights and obligations of the parties under the Bonds.

## COUNT I — ERISA

164.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

165.     of ERISA, 29 U.S.C. § 1104(a), provides, in relevant part:

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

166.    Section 409(a) of ERISA, 29 U.S.C. § 1109(a), provides, in relevant part:

Section 404(a)

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

167.    By failing to follow proper Funds' procedure for authorization and payment of financial expenditures, including payment of wages, increases in compensation, payment of benefits and payment of expenses for personal benefit and gain, and by instead taking advantage of her position for personal profit and gain, Defendant Dorothy McBride failed to discharge her duties with respect to the Funds solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Funds, as required by Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(A)(1)(a), and likewise failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, as required by Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B).

168.    By failing to follow proper Funds' procedure for authorization and payment of financial expenditures, including payment of wages, increases in compensation, payment of benefits and payment of expenses for personal benefit and gain, and by instead taking advantage of her position for personal profit and gain, Defendant Dorothy McBride dealt with assets of the Funds in her own personal interest and acted on her own personal interest

- 25 -

while her own personal interest was adverse to those of the Funds, in violation of Sections 404(a) and 409(a) of ERISA, 29 U.S.C. §§ 1104(a) and 1109(a).

169. As a direct and proximate result of the conduct described herein, Defendant Dorothy McBride caused the Funds to suffer financial losses for which she personally is liable and received unjust profits which she is liable to disgorge, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

## COUNT II — ERISA

170. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

171. Section 406 of ERISA, 29 U.S.C. § 1106 provides, in relevant part:

(a) Transactions between plan and party in interest except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

- 26 -

(b) Transactions between plan and fiduciary a fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

172.    By wrongfully taking Funds' assets in the form of salary, benefits, and other compensation to which she and others by and through Defendant Dorothy McBride's actions and inactions were not entitled, Defendant Dorothy McBride, acting in her fiduciary capacity, engaged in prohibited transactions, and thus failed to discharge her duties with respect to the Funds solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, as required by Sections 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(A)(1)(a) and 406 of ERISA, 29 U.S.C. § 1106; and thus likewise failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, as required by Sections 404(a)(1)(B) of ERISA, 29 U.S.C. §1104(a)(1)(B) and 406 of ERISA, 29 U.S.C. §1106.

173.    As a direct and proximate result of her actions, Defendant Dorothy McBride caused the Funds to suffer financial losses for which she personally is liable, and received unjust profits through prohibited transactions, which she is liable to disgorge, pursuant to Sections 409(a) of ERISA, 29 U.S.C. § 1109(a) and 406 of ERISA, 29 U.S.C. §1106.

## COUNT III — ERISA

174.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

175.    Section 502(a)(3) of ERISA, 29 U.S.C. §1132(c) mandates that a civil action may be brought:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan...

176.    The Fraud Defendants, jointly and severally, each knowingly participated in actions that resulted in the Fraud Defendants each getting ill-gotten gains from the Funds because of their respective actions in violation of 29 U.S.C. §1132(a)(3).

177.    Pursuant to 29 U.S.C. §1132(a)(3), the Funds seeks equitable relief against the Fraud Defendants, jointly and severally, to enforce ERISA and the written terms of the Funds.

178.    Upon information and belief, the Fraud Defendants, jointly and severally, are in actual or constructive possession of Funds' proceeds and are therefore in possession of moneys or other such assets that as a matter of equity and good conscience belong to the Funds.

179.    The Fraud Defendants, jointly and severally, are on notice of their obligations and the Funds' rights pursuant to the written terms of the Funds.

180.    The Fraud Defendants, jointly and severally, have knowingly failed and/or refused to turn over Funds' money and assets wrongfully held by the Fraud Defendants, jointly and severally.

181.    The Fraud Defendants' joint and several failure and/or refusal to turn over Funds' money and assets violates the terms of the Funds and ERISA.

182.     The Funds are therefore entitled to equitable restitution in the form of a constructive trust or equitable lien with respect to the disputed funds held in Fraud Defendants' joint and several actual or constructive possession.

183.     Fraud Defendants should be jointly and severally ordered to turn over to the Funds any money and/or assets in their respective individual and/or joint actual or constructive possession to enforce the written terms of the Funds and ERISA.

### COUNT IV — FAITHLESS SERVANT

184.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

185.     Under New Jersey common law, an employee is to be loyal to his or her employer and is prohibited from acting in any manner inconsistent with his or her agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his or her duties.

186.     Under New Jersey common law, under what is commonly referred to as the "faithless servant doctrine," an individual who owes a duty of fidelity to a principal and who is faithless in the performance of his or her services is generally disentitled to recover his or her compensation, whether commissions or salary.

187.     Therefore, under New Jersey common law, when an employee engages in acts of disloyalty, complete and permanent forfeiture of compensation, deferred or otherwise, is warranted.

188.     As a result of her actions, Defendant Dorothy McBride was a "faithless servant" as that term is defined under New Jersey common law and should not in good conscience be allowed to keep the financial proceeds of her actions.

189.    Accordingly, Defendant Dorothy McBride cannot in good conscience retain the money she and others, by and through Defendant Dorothy McBride's actions and inactions, gained because of her violation of duty and care to the Funds and should be Court ordered to turn over all such wrongfully gained money and assets, including, but not limited to all unauthorized salary, payment, and benefits.

### COUNT V— UNJUST ENRICHMENT/MONEY HAD AND RECEIVED

190.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

191.    Under New Jersey common law, a claim for unjust enrichment requires that the plaintiff show (1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable.

192.    As a result of Fraud Defendants' joint and several actions, by taking advantage of Defendant Dorothy McBride's position and familial relationships for personal profit and gain, Fraud Defendants unjustly financially benefitted to the financial detriment of the Funds, and Fraud Defendants should not in good conscience be allowed to keep the financial proceeds of their wrongful actions and inactions.

193.    Accordingly, Fraud Defendants, jointly and severally, cannot in good conscience retain the money gained because of violation of duty and care to the Funds and should be Court ordered to turn over all money for which Fraud Defendants, jointly and severally, as well as others, were unjustly enriched to the Funds' detriment, including, but not limited to all unauthorized salary, payment, and benefits.

### COUNT VI — FRAUDULENT CONVEYANCE

194.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

195. As a result of familial use of insider knowledge and control over Funds' assets, Fraud Defendants, jointly and severally, and others, inappropriately manipulated Funds' practice and procedure and made various misstatements, taking for themselves money belonging to the Funds to which they were not entitled, and thus knowingly participated in a fraudulent conveyance of pension and welfare benefits, salary, and additional moneys, as defined by N.J.S.A. 25:2-25, N.J.S.A. 25:2-26, and N.J.S.A. 25:2-27.

196. As a result of Fraud Defendants' joint and several use of familial insider knowledge and control over Funds' assets, the Fraud Defendants, jointly and severally, as well as others, inappropriately manipulated Funds' practice and procedure and made various misstatements, causing payment of money belonging to the Funds to be remitted to themselves and others, and thus knowingly participated in a fraudulent conveyance of pension and welfare benefits, salary, and additional moneys, as defined by N.J.S.A. 25:2-25, N.J.S.A. 25:2-26, and N.J.S.A. 25:2-27.

197. As a result of these actions, Fraud Defendants, jointly and severally, are personally liable to the Funds for amounts wrongfully paid to themselves and others, and the fraudulent conveyances should be voided, and such amounts paid to Fraud Defendants and others because of the fraudulent transactions should be disgorged.

## COUNT VII – DECLARATORY JUDGMENT

198. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

199. The Funds seek a declaration by this Court of NGM's obligations under the Bonds to provide coverage for the Funds' losses arising from the Fraudulent Scheme.

200.    The Funds contend that NGM has a duty to pay for the Funds' losses caused by the Fraudulent Scheme, pursuant to the terms and conditions of the Bonds.  NGM disputes the Funds' contention.

201.    NGM contends that it does not have a duty to pay for the Funds' losses caused by the Fraudulent Scheme because it is entitled to rescind the Bonds.  The Funds dispute NGM's contention.

202.    The Funds contend that they have complied with all the terms and conditions of the Bonds, except to the extent performance has been or is excused or waived.

203.    The Funds contend that the Bonds provide coverage for their losses and that NGM's attempt to rescind the Bonds is contrary to law and public policy.

204.    An actual and justiciable controversy exists between the Funds and NGM concerning the matters alleged herein.

205.    The Funds are entitled to a declaration by the Court pursuant to 28 U.S.C. §§ 2201 and 2202 that NGM's attempt to rescind the Bonds is wrong and improper, and that NGM must honor its duties under the Bonds, including its duty to pay for the Funds' losses sustained in connection with the Fraudulent Scheme, up to the limits of liability of the Bonds.

206.    Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT VIII – BREACH OF CONTRACT

207.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

208.    Pursuant to the terms of the Bonds, NGM has a duty to pay for losses sustained by the Funds arising from the Fraudulent Scheme.

209.    The Funds have performed all their obligations under the Bonds.

210.   As a result of the Fraudulent Scheme, the Funds have sustained losses covered under the Bonds.

211.   NGM has breached its obligation as set forth in the Bonds by its failure to pay the losses sustained by the Funds as result of the Fraudulent Scheme, up to the limits of liability of the Bonds.

212.   As a direct and proximate result of NGM's breach of the Bonds, the Funds have been deprived of the benefit of insurance coverage for the losses they have sustained in connection with the Fraudulent Scheme.

213.   As a direct and proximate result of NGM's breach of the Bonds, the Funds have been damaged, will continue to be damaged, in an amount to be proven at trial for all damages, costs, payments, and all other sums incurred to date.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter a judgment:

1.   Ordering the Fraud Defendants, jointly and severally, to document and financially account for any funds she and others by her actions and inactions received from the Funds in salary, benefits or other such payments and the basis and rational for the distribution of the payments to the Defendants and other insiders, and well as an accounting of further distribution to others;

2.   Deeming Defendant Dorothy McBride in violation of Sections 404(a), 406, 409(a) of ERISA, 29 U.S.C. §§ 1104(a), 1106, and 1109(a) and common law, and thus entering an Order requiring Defendant Dorothy McBride to return to the Funds any and all salary and/or other such payments wrongfully paid to her as a result of her transgressions, as well as to forfeit all Pension benefits to which she was not entitled;

- 33 -

3.     Ordering the joint and several return by Fraud Defendants of any Funds' money and assets wrongfully in their respective custody or control;

4.     Ordering a constructive trust and/or equitable lien in favor of the Funds' upon any settlement funds or any property into which they have been converted which are in the Fraud Defendants' joint and several possession or under the Fraud Defendants' joint and several control;

5.     Enjoining the Fraud Defendants, jointly and severally, from dissipating any Funds' money or assets in their individual or joint actual or constructive possession until the Funds' rights can be adjudicated;

6.     Enjoining the Fraud Defendants, jointly and severally, from transferring or disposing of the Funds' money or assets in their individual or joint actual or constructive possession which would prejudice, frustrate or impair the Funds' ability to recover same;

7.     Ordering Fraud Defendants, jointly and severally, to pay reasonable attorney's fees and costs of the action pursuant to ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1);

8.     Providing such other legal and equitable relief as the Court deems proper, including pre-judgment and post-judgment interest and injunctive relief against the Fraud Defendants and other insiders, where warranted; and

9.     Declaring that NGM's attempt to rescind the Bonds is wrong and improper and that NGM must honor its duties under the Bonds, including its duty to pay for the Funds' losses sustained in connection with the Fraudulent Scheme, up to the limits of liability of the Bonds; and

10.    Ordering judgment against NGM awarding compensatory and consequential damages in an amount to be determined at trial, attorneys' fees, pre and post-judgment interest and costs of suit, and such other relief as the Court deems equitable and just.

Dated: March 8, 2023

/s/ Michael S. Adler
**COHEN, WEISS AND SIMON LLP**
Michael S. Adler, Esq.
Jonathan M. Cerrito, Esq.
900 Third Avenue
New York, New York 10022
212-563-4100
madler@cwsny.com
jcerrito@cwsny.com

*Attorneys for Plaintiffs*

/s/ Stephen M. Orlofsky
**BLANK ROME LLP**
A Pennsylvania LLP
Stephen M. Orlofsky, Esq.
New Jersey Resident Partner
Natasha Romagnoli, Esq. (admitted *pro hac vice*)
Kelly A. Jauregui, Esq.
Michael C. Lupton (to be admitted *pro hac vice*)
300 Carnegie Center, Suite 220
Princeton, New Jersey 08540
609-750-2646
Stephen.Orlofsky@BlankRome.com
Natasha.Romagnoli@BlankRome.com
Kelly.Jauregui@BlankRome.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Pursuant to Local Civil Rule 11.2, I certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court, or of any arbitration or administrative proceeding, except for *USA v. McBride*, 2:21-mj-09051-CLW-1, a criminal action filed against Defendant Dorothy McBride in this District, arising in part from the events described herein.

Dated: March 8, 2023

*/s/ Michael S. Adler*

MICHAEL S. ADLER

# EXHIBIT A

# NGM INSURANCE COMPANY

EMPLOYEE THEFT COVERAGE IN COMPLIANCE WITH THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)

**POLICY NUMBER:** F-834801

Limit of Liability: Five Hundred Thousand and 00/100 _____ Dollars $ 500,000.00 per "Occurrence".

**First Named Insured:** Allied Industries Pension Plan

**Other Insured(s):**

**Address of First Named Insured:** 155 Changebridge Road        Montville, NJ 07045

**The Policy Period is Continuous** from 12:01 A.M. standard time October 19, 2014 _____ at the address of the Insured as stated herein.

**Cancellation of Prior Coverage:** By acceptance of this Policy you give us notice canceling prior policy Number(s): _____ the cancellation to be effective at the time this policy becomes effective.

**The Riders listed here Form a Part of This Policy:**

---

**EXECUTED BY:** _~signature~ Brian Beggs, Vice President_        This policy is not valid unless countersigned below.

**COUNTERSIGNED BY:** _____        Date: October 3, 2014

    **Printed Name:**  Jerry Petrizzi

**Various provisions of this policy restrict coverage.** Read the entire policy carefully to determine rights, duties and what is or is not covered. Throughout this policy the words "You" and "Your" refer to the Named Insured(s) shown above.

The words "we", "us" and "our" refer to **NGM INSURANCE COMPANY**. Words and phrases in quotation marks are defined in the policy.

**A. COVERAGE:** We will pay for loss of "Money" or "Securities" resulting directly from "Employee Theft".

**B. LIMIT OF LIABILITY:** The most we will pay for loss in any one "Occurrence" is the applicable Limit of Liability shown above.

**C. DEFINITIONS:**

1. **"Employee"** means any natural person that is: a. a trustee, an officer, employee, administrator or a manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan (hereinafter called Plan) insured under this policy, and b. Your director or trustee while that person is handling funds of any Plan insured under this policy.

2. **"Employee Theft"** means any fraudulent or dishonest acts including larceny, theft, embezzlement, employee forgery, misappropriation, wrongful abstraction, wrongful conversion, or willful misapplication) committed by any Employee or Employees, acting alone or in collusion with others.

3. **"Occurrence"** means all loss caused by, or involving, one or more "Employees," whether the result of a single act or series of acts.

4. **"Money"** means currency, coins and bank notes in current use having a face value.

5. **"Securities"** means negotiable and nonnegotiable instruments or contracts representing either "Money" or other property.

**D. EXCLUSIONS:**

We will not pay for loss as specified below:

1. **"Employee" Canceled Under Prior Coverage:** Loss caused by any "Employee" of yours, or predecessor in interest of yours, for whom similar prior coverage has been canceled and not reinstated since the last such cancellation.

2. **Indirect Loss:** Loss that is an indirect result of any act or "Occurrence" covered by this coverage including, but not limited to, loss resulting from:

    a. Your inability to recognize income that you would have realized had there been no loss of Covered Property.

    b. Payment of damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this policy.

    c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

3. **Legal Expenses:** Expenses related to any legal action.

**E. CONDITIONS:**

1. **Premiums:** The First Named Insured shown is responsible for the payment of all premiums; and will be the payee for any return premiums we pay.

2. **Two or More Plans:** If two or more plans are insured under this coverage, any payment we make for loss:

    a. Sustained by two or more Plans, or

    b. Commingled funds or other property of two or more Plans that arises out of one "Occurrence," is to be shared by each Plan sustaining loss in the proportion that the amount of coverage required for each such Plan under ERISA provisions bears to the total of those amounts.

3. **Duties in the Event of Loss:** After you discover a loss or a situation that may result in loss of Covered Property you must:

    a. Notify us as soon as possible.

    b. Submit to an examination under oath at our request and give us a signed statement of your answers.

    c. Give us a detailed, sworn proof of loss within 120 days.

    d. Cooperate with us in the investigation and settlement of any claim.

4. **Discovery Period for Loss:** We will pay only for covered loss discovered no later than one year from the end of the policy period.

5. **Legal Action Against Us:** Any Legal action brought against must be brought within 2 years from the date you discover the loss.

You may not bring any legal action against us involving loss unless:

    a. You have complied with all the terms of this coverage.

    b. 90 days have passed after you have filed proof of loss with us.

68-QQ-ERISA(7.1.2010)                **This is page One of a Two page document.**

                                        68-QQ-ERISA-03

## NGM INSURANCE COMPANY

**EMPLOYEE THEFT COVERAGE IN COMPLIANCE WITH THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**

**POLICY NUMBER: F-834801**

6. **Loss Sustained During Prior Coverage:**

   a. If you, or any predecessor in interest, sustained loss during the period of any prior coverage that you or the predecessor in interest could have recovered under that coverage except that the time within which to discover loss had expired, we will pay for it under this policy, provided:

      i. This bond became effective at the time of cancellation or termination of the prior coverage; and

      ii. The loss would have been covered by this policy had it been in effect when the acts or events causing the loss were committed or occurred.

   b. The coverage under this Condition is part of, not in addition to, the Limits of Liability applying to this policy and is limited to the lesser of the amount recoverable under this policy as of its effective date or the prior coverage had it remained in effect.

7. **Loss Covered Under This Policy and Prior Coverage Issued by Us or Any Affiliate:** If any loss is covered partly by this policy or partly by any prior canceled or terminated coverage that we, or any affiliate, had issued to you or any predecessor in interest the most we will pay is the larger of the amount recoverable under this policy or the prior coverage.

8. **Non-Accumulation of Limit of Liability:** Regardless of the number of years this coverage remains in force or the number of premiums paid, the Limit of Liability does not accumulate from year-to-year or period-to-period.

9. **Other Insurance:** This policy does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity. However, this policy will not apply to the amount of loss that is more than the applicable Limit of Liability shown.

10. **Ownership of Property; Interests Covered:** The property covered under this policy is limited to property that you own or hold or for which you are legally liable. However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization.

11. **Policy Period:** The Policy Period is shown in Item 2 subject to the Loss Sustained During Prior Coverage condition; we will only pay for loss that you sustain through acts committed or events occurring during the Policy Period.

12. **Records:** You must keep records of all Covered Property so we can verify the amount of any loss.

13. **Recoveries:** Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this policy will be distributed as follows:

   a. To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Liability;

   b. Then to us, until we are reimbursed for the settlement made.

   Recoveries *do not* include any recovery –

   a. From insurance, suretyship, reinsurance, security, or indemnity taken for our benefit; or

   b. Of original securities after duplicates of them have been issued.

14. **Territory:** This policy covers only acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico, Canal Zone, or Canada.

15. **Transfer of Your Rights of Recovery Against Others:**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

16. **Valuation:** Subject to the Limit of Liability provision, we will pay for:

   a. Loss of "Money" but only up to and including its face value.

   b. Loss of "Securities" but only up to and including their face value on the day the loss was discovered. We may, at our option:

      i. Pay the value of such "Securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "Securities;" or

      ii. Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "Securities." However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the "Securities" at the close of business on the day the loss was discovered; or the Limit of Liability shown above.

17. **Cancellation of the Policy as an Entirety:**

   a. The first Named Insured shown may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      i. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

      ii. 30 days before the effective date of cancellation if we cancel for any other reason.

   c. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

   d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

   e. If this policy is canceled we will send the first Named Insured any premium refund due.

   f. If notice is mailed proof of mailing will be sufficient proof of notice.

18. **Cancellation As to Any "Employee":** This coverage is canceled as to any "Employee":

   a. Immediately upon discovery by You or Any of your partners, officers or directors not in collusion with the "Employee" of any dishonest act committed by that "Employee" whether before or after becoming employed by you.

   b. On the date specified in a notice mailed to you. That date will be at least 30 days after the date of mailing. The mailing of notice to you at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

19. **Inflation Guard:** If, at the inception of this policy, you have a Limit of Liability that is equal or greater than that required under ERISA, we agree to automatically increase that Limit of Liability, to equal the amount required under ERISA at the time you discover a loss, subject to the Non-Accumulation of Liability (8. above), and further subject to a maximum of $500,000.

20. **Changes:** This policy contains all the agreements between you and us concerning the coverage afforded. The first Named Insured shown is authorized to make changes in the terms of this policy with our consent. The terms of this policy can be amended or waived only by endorsement issued by us and made part of this policy.

68-QQ-ERISA(7.1.2010)                    This is page Two of a Two page document.

68-QQ-ERISA-03

# EXHIBIT B

# ERISA DISHONESTY
# BOND

Edition of October 1, 2017

NGM INSURANCE COMPANY
(Herein called Company)

**Policy No.**
F-834801

**DECLARATIONS**

**Item 1.**   Name of Employee Benefit Plans (herein called Insured):

Allied Industries Pension Plan

Principal Address:  155 Changebridge Road

Montville, NJ 07045

**Item 1a.** Plan Sponsor

Plan Sponsor Address:

| | | |
|---|---|---|
| **Item 2.** | Policy Period: from 12:01 a.m. on  October 1, 2018 <br> (MONTH, DAY, YEAR) | to 12:01 a.m. on | continuous <br> (MONTH, DAY, YEAR) |

**Item 3.**   **INSURING AGREEMENT, LIMIT OF INSURANCE**

| | **Limit of Insurance** <br> **Per Occurrence** | **Deductible** <br> **Per Occurrence** |
|---|---|---|
| 1.   Fraud or Dishonesty | $500,000.00 | $0.00 |

**Item 4.**   **ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED**

68-QQ-9025 (Ed. 1.22.2018)

**Item 5.**   **CANCELLATION OF PRIOR INSURANCE**

By acceptance of this Policy you give us notice cancelling prior policy Nos.

Form Number  68-QQ-ERISA for Policy Number  F-834801

EXECUTED BY: _Nancy Giordano-Ramos_
   Nancy Giordano-Ramos, Vice President

COUNTERSIGNED BY: _Connie Lopez_      Date: October 1, 2018
   Printed Name: Connie Lopez

SP 00 03 10 17
Printed in U.S.A.          Copyright, The Surety & Fidelity Association of America, 2017

| | |
|---|---|
| **ERISA DISHONESTY BOND** | Throughout this Policy the words "you" and "your" refer to the Insured(s) shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. Read the entire Policy carefully to determine rights, duties and what is or is not covered. Words and phrases defined in the Policy are in **bold** type. This Policy's coverage is limited to the acts of **covered persons,** as defined in Definition C.2. |
| **A. CONSIDERATION CLAUSE** | In return for the payment of the premium, and subject to the Declarations, Insuring Agreement, Definitions, Exclusions, Conditions and other terms of this Policy, we will pay for loss covered by the Insuring Agreement of this Policy that you sustain resulting directly from acts committed or events occurring at any time and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss, Condition E.8. |
| **B. INSURING AGREEMENT** | **Fraud or Dishonesty**<br>We will pay for loss of **money, securities** or **other property** resulting directly from **fraud or dishonesty** committed by a **covered person**. |

**C. DEFINITIONS**

1.  **Cash** means United States or Canadian bills and coins in current use and having a face value that are accepted by the United States or by the government of Canada as legal tender for the payment of debts.

2.  **Covered person** means any natural person who is

    a.  a trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any **employee benefit plan(s)** insured under this insurance; or

    b.  a director, officer, employee or trustee of the Plan Sponsor, but only while that person is handling **money**, **securities** or **other property** of an **employee benefit plan** insured under this insurance;

    but does not include any agent, broker, person leased to you by a labor leasing firm, factor, commission merchant, consignee, independent contractor or representative of the same general character.

3.  **Cryptocurrency** means a digital or electronic medium of exchange, operating independently of a central bank, in which encryption techniques are used to regulate the generation of units and to verify the transfer of such units from one person to another.

4.  **Employee benefit plan(s)** means any welfare or pension benefit plan listed in the Declarations as an Insured that is subject to the Employee Retirement Income Security Act of 1974 (ERISA), as amended.

5.  **Fraud or dishonesty** means larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wrongful conversion or willful misapplication, or any other fraudulent or dishonest act, including acts prohibited by title 18, section 1954 of the U.S. Code.

6.  **Money** means:

    a.  **Cash**;

    b.  Demand and savings deposits at financial institutions; and

    c.  Travelers checks, register checks and money orders held for sale to the public.

7.  **Occurrence** means all loss or losses caused by, or involving, any one **covered person**, acting alone or in collusion with others.

8.  **Other property** means any tangible property other than **money** and **securities** that has intrinsic value but does not include any property excluded under this insurance.

9.  **Securities** mean negotiable and nonnegotiable instruments or contracts representing either **money** or property and includes stocks, bonds, notes, repurchase agreements, commodities contracts and other instruments regularly bought and sold by broker dealers on stock or commodities exchanges, but does not include **money.**

**D. EXCLUSIONS**

We will not pay for loss as specified below:

    **1. Acts Committed by You**

      Loss resulting from any dishonest act committed by the Insured **employee benefit plan(s)** whether acting alone or in collusion with other persons. This exclusion does not affect coverage for loss under this Policy caused by the acts of **covered persons.**

    **2. Fire**

      Loss from damage to the premises resulting from fire, however caused.

    **3. Governmental Action**

      Loss resulting from seizure or destruction of property by order of governmental authority.

    **4. Indirect Loss**

      Loss that is an indirect result of any act or **occurrence** covered by this Policy including, but not limited to, loss resulting from:

      a. Your inability to realize income that you would have realized had there been no loss;

      b. Payment of damages of any type for which you are legally liable unless you establish that the act or acts that gave rise to the damages involved conduct which caused a covered loss of **money, securities** or **other property** which was in your custody and control and for which you were responsible prior to the loss; or

      c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

    **5. Legal Expenses**

      Expenses related to any legal action.

    **6. Nuclear Chemical or Biological**

      Loss resulting from nuclear reaction, nuclear radiation or radioactive, chemical or biological contamination, or any related act or incident.

    **7. War and Similar Actions**

      Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

    **8. Prior Dishonesty**

      Loss resulting from the dishonest or fraudulent acts of a **covered person** if you, or any employee, trustee, fiduciary or plan administrator of the Plan Sponsor or an Insured **employee benefit plan** who is not in collusion with such **covered person,** knows or knew prior to such loss of any prior dishonest or fraudulent act committed by such person, whether in the employment of the Plan Sponsor or any Insured **employee benefit plan** or otherwise, whether or not of the type covered under this Policy and without regard to whether the knowledge was obtained before or after the commencement of this Policy.

    **9. Inventory Shortages**

      Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

      a. An inventory computation; or

      b. A profit and loss computation.

      However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records to support the amount of loss claimed.

    **10. Cryptocurrency**

      Loss resulting from the theft, disappearance or destruction of **cryptocurrency** or from the change in value of **cryptocurrency.**

**11. Negligence**

Loss resulting from the negligence of a **covered person**.

**12. Confidential Information**

Loss resulting from the theft, disappearance, destruction or disclosure of confidential information including, but not limited to, trade secrets, personal information, personally identifiable information, customer lists and intellectual property; provided however that this exclusion will not apply to loss that is otherwise covered under this Policy, caused by a **covered person's** access to, use of, or disclosure of confidential information to commit acts of **fraud or dishonesty**.

**13. Data Breach Costs**

Expenses related to your obligations to comply with federal and state privacy laws and Payment Card Industry Data Security Standards (if applicable) arising from a data security breach, including, but not limited to, expenses related to notifying affected individuals when the affected individuals' personally identifiable financial or medical information was stolen, accessed, downloaded or misappropriated while in your care, custody or control, forensic audit expenses and fines and penalties.

---

**E. CONDITIONS**

**1. Cancellation**

a. The Plan Sponsor shown in the Declarations may cancel this Policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this Policy by mailing or delivering to the Plan Sponsor written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

c. We will mail or deliver our notice to the Plan Sponsor's last mailing address known to us.

d. Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

e. If this Policy is canceled, we will send the Plan Sponsor any premium refund due. If we cancel, the refund will be pro rata. If the Plan Sponsor cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

f. If notice is mailed, proof of mailing will be sufficient proof of notice.

**2. Changes**

This Policy contains all the agreements between you and us concerning the insurance afforded. The Plan Sponsor shown in the Declarations is authorized on behalf of all insureds to agree with us on changes in the terms of this Policy. If the terms are changed, the changes will be shown in an endorsement issued by us and made a part of this Policy.

**3. Concealment, Misrepresentation or Fraud**

This Policy is void in any case of fraud by you as it relates to this Policy at any time. It is also void if any Insured or the Plan Sponsor, at any time, intentionally conceals or misrepresents a material fact concerning:

a. This insurance;

b. The covered property;

c. Your interest in the covered property; or

d. A claim under this insurance.

3

4.  **Consolidation and Merger**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity any additional persons become **covered persons**:

a.  The Plan Sponsor must give us written notice and obtain our written consent to extend this Policy to such additional **covered persons**. We may condition our consent upon payment of an additional premium; but

b.  For the first 60 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, any insurance afforded for **covered persons** also applies to these additional **covered persons** for acts committed or events occurring within said 60 day period.

5.  **Discovery of Loss**

Discovery of loss occurs when you or the Plan Sponsor first become aware of facts which would cause a reasonable person to assume that a loss covered by this Policy has been or will be incurred, even though the exact amount or details of the loss may not then be known. Discovery also occurs when you or the Plan Sponsor receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this insurance.

6.  **Duties in the Event of Loss**

After you or the Plan Sponsor discover a loss or a situation that may result in a loss you or the Plan Sponsor must:

a.  Notify us as soon as possible;

b.  Submit to examination under oath at our request and give us a signed statement of your answers;

c.  Give us a detailed, sworn proof of loss within 120 days; and

d.  Cooperate with us in the investigation and settlement of any claim.

7.  **Employee Benefit Plan(s)**

a.  It is the responsibility of you or the Plan Sponsor to select a Limit of Insurance for the Insuring Agreement that is sufficient to provide a limit that is at least equal to that required under ERISA if each **employee benefit plan** were separately insured.

b.  Any payment we make to the Plan Sponsor for loss sustained by any **employee benefit plan** will be held by the Plan Sponsor for the use and benefit of the plan(s) sustaining the loss.

c.  If two or more **employee benefit plans** are insured under this insurance, any payment we make for loss:

(1)  Sustained by two or more **employee benefit plans**; or

(2)  Of commingled **money, securities** or **other property** of two or more **employee benefit plans**;

that arises out of one **occurrence** and cannot be allocated specifically to any one **employee benefit plan**, is to be shared by each **employee benefit plan** sustaining loss in the proportion that the limit of insurance required under ERISA for each such **employee benefit plan** bears to the total of those limits.

8.  **Extended Period to Discover Loss**

a.  We will pay for loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you within one year following the date of termination or cancellation.

b.  However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you that offers the same coverage afforded by this Policy in an amount no less than the minimum amount required under ERISA section 412 and provides coverage for loss sustained prior to its effective date.

9.  **Joint Insured**

4

a. The Plan Sponsor shown in the Declarations is responsible for the payment of all premiums and will be the payee for any return premiums we pay.

b. If more than one Insured is named in the Declarations, the Plan Sponsor may act for itself and for every other Insured for all purposes related to this insurance.

c. If the Plan Sponsor, any Insured or fiduciary of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

d. If this Policy or any of its coverage is canceled or terminated as to any Insured, Condition E.8. Extended Period to Discover Loss applies separately to that Insured.

**10. Legal Action Against Us**

You may not bring any legal action against us involving loss:

a. Unless you and the Plan Sponsor have complied with all the terms of this Policy; and

b. Until 90 days after you or the Plan Sponsor have filed proof of loss with us; and

c. Unless brought within 2 years from the date you or the Plan Sponsor discover the loss.

**11. Liberalization**

If we adopt any revision that would broaden the coverage under this Policy without additional premium within 45 days prior to or during the Policy Period, the broadened coverage will immediately apply to this insurance.

**12. Limit of Insurance**

The most we will pay for loss in any one **occurrence** is the Limit of Insurance shown in the Declarations.

**13. Non-Cumulation of Limit of Insurance**

Regardless of the number of years this Policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or Policy Period to Policy Period.

**14. Other Insurance**

This Policy does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this Policy will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity.

**15. Ownership of Property, Interests Covered**

The property covered under this Policy is limited to property:

a. That you own or hold; or

b. That is owned and held by someone else under circumstances that made you responsible for the property prior to, and independent of, the loss.

However, this Policy is for your benefit only. It provides no rights or benefits to any other person or organization.

**16. Records**

You must keep records of all covered property so we can verify the amount of any loss.

**17. Recoveries**

a. Recoveries, whether effected by you or us, shall be applied, net of the expense of such recovery, in the following manner and order:

(1) To the satisfaction of your loss which would otherwise have been paid under this Policy but for the fact that it is in excess of the Limit of Insurance;

(2) Then to us, until we are reimbursed for the settlement made;

(3) Then to you for any loss not covered by this Policy.

b. Recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for our benefit.

c. If original securities are recovered after duplicates of such securities have been issued, the original securities shall be surrendered to us.

**18. Territory**

This Policy covers only acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico or Canada. In addition, we will pay for loss caused by any **covered person** while temporarily outside of said territories for a period of not more than 90 days.

**19. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without our written consent.

**20. Transfer of Your Rights of Recovery Against Others to Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You also must do everything necessary to secure those rights and do nothing after loss to impair our actual or potential rights of recovery.

**21. Valuation — Settlement**

a. Subject to the Limit of Insurance provision we will pay for:

(1) Loss of **money** but only up to and including its face value. We may, at our option, pay for loss of **money** issued by any country other than the United States of America:

(i) At face value in the **money** issued by that country; or

(ii) In the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.

(2) Loss of **securities** but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

(i) Pay the value of such **securities**, or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those **securities**; or

(ii) Pay the cost of any lost securities bond required in connection with issuing duplicates of the **securities**. However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(a) Value of the **securities** at the close of business on the day the loss was discovered; or

(b) Limit of Insurance.

(3) Loss of, or loss from damage to **other property**. However, we will not pay more than the least of the following:

(i) The Limit of Insurance applicable to the lost or damaged property;

(ii) The cost to replace the lost or damaged property with property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(4) We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property actually is repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

b. We may, at our option, pay for loss of, or loss from damage to, property other than **money**:

(1) In the **money** of the country in which the loss occurred; or

**6**

(2) In the United States of America dollar equivalent of the **money** of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

c.  Any property that we pay for or replace becomes our property.

**22. Cancellation as to Any Covered Person**

Coverage under this Policy is canceled as to any **covered person**:

a.  Immediately upon discovery by any Insured **employee benefit plan**, or by any employee, trustee, fiduciary or plan administrator of such an Insured **employee benefit plan** or Plan Sponsor who is not in collusion with the **covered person**, of any dishonest act committed by that **covered person** whether before or after becoming a **covered person**. Whether such discovery occurs prior to or after commencement of this Policy, there is no coverage under the Insuring Agreement for loss or losses resulting from acts committed by that **covered person** after the date of such discovery.

b.  On the date specified in a notice mailed to you. That date will be at least 30 days after the date of mailing. The mailing of notice to you at the last mailing address of the Plan Sponsor known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

**23. Deductible**

The deductible set forth in the Declarations shall be applicable to a loss suffered by an **employee benefit plan** only after that **employee benefit plan** has received from

us: a.  $500,000; or

b.  $1,000,000, if the **employee benefit plan** holds "employer securities" within the meaning of section 407(d)(1) of ERISA.

---

IN WITNESS WHEREOF, we have caused this Policy to be executed on the Declarations page.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ERISA AMENDATORY ENDORSEMENT

This endorsement modifies ERISA DISHONESTY BOND Policy No. F-834801

**Item 2.** is further amended as follows:

Policy Period end date is deleted and the policy period shall be continuous until cancelled according to the provisions of
E. CONDITIONS 1. Cancellation, or as modified by endorsement.

**Item 3. INSURING AGREEMENT, LIMIT OF INSURANCE** is amended as follows:

2. If, at the inception of this Policy, you have a Limit of Insurance Per Occurrence that is equal to or greater than that required under the Employee Retirement Income Security Act of 1974 (ERISA), we agree to automatically increase that Limit of Insurance Per Occurrence to equal the amount required under ERISA at the time you discover a loss, subject to:
   a.    Section E. CONDITIONS, ITEM 13.  Non-Cumulation of Limit of Insurance, and
   b.    A maximum of $500,000.

End of Endorsement

NGM Insurance Company

68-QQ-9025 (Ed.1.22.2018)

# EXHIBIT C

## NGM INSURANCE COMPANY

**EMPLOYEE THEFT COVERAGE IN COMPLIANCE WITH THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**

**POLICY NUMBER:** F-834803

**Limit of Liability:** Five Hundred Thousand and 00/100 _____ Dollars $500,000.00 per "Occurrence".

**First Named Insured:** Amalgamated Local 427 and Allied Industries Health Welfare Fund

**Other Insured(s):**

**Address of First Named Insured:** 155 Changebridge Road        Montville, NJ 07045

The **Policy Period** is Continuous from 12:01 A.M. standard time October 19, 2014 _____ at the address of the Insured as stated herein.

**Cancellation of Prior Coverage:** By acceptance of this Policy you give us notice canceling prior policy Number(s): _____ the cancellation to be effective at the time this policy becomes effective.

**The Riders listed here Form a Part of This Policy:**

---

**EXECUTED BY:**    Brian Beggs, Vice President        **This policy is not valid unless countersigned below.**

**COUNTERSIGNED BY:** _____    Date: October 3, 2014 _____

**Printed Name:** Jerry Petrizzi

**Various provisions of this policy restrict coverage.** Read the entire policy carefully to determine rights, duties and what is or is not covered. Throughout this policy the words "You" and "Your" refer to the Named Insured(s) shown above.

The words "we", "us" and "our" refer to **NGM INSURANCE COMPANY.** Words and phrases in quotation marks are defined in the policy.

**A. COVERAGE:** We will pay for loss of "Money" or "Securities" resulting directly from "Employee Theft".

**B. LIMIT OF LIABILITY:** The most we will pay for loss in any one "Occurrence" is the applicable Limit of Liability shown above.

**C. DEFINITIONS:**

1. **"Employee"** means any natural person that is: a. a trustee, an officer, employee, administrator or a manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan (hereinafter called Plan) insured under this policy, and b. Your director or trustee while that person is handling funds of any Plan insured under this policy.

2. **"Employee Theft"** means any fraudulent or dishonest acts including larceny, theft, embezzlement, employee forgery, misappropriation, wrongful abstraction, wrongful conversion, or willful misapplication) committed by any Employee or Employees, acting alone or in collusion with others.

3. **"Occurrence"** means all loss caused by, or involving, one or more "Employees," whether the result of a single act or series of acts.

4. **"Money"** means currency, coins and bank notes in current use having a face value.

5. **"Securities"** means negotiable and nonnegotiable instruments or contracts representing either "Money" or other property.

**D. EXCLUSIONS:**

We will not pay for loss as specified below:

1. **"Employee" Canceled Under Prior Coverage:** Loss caused by any "Employee" of yours, or predecessor in interest of yours, for whom similar prior coverage has been canceled and not reinstated since the last such cancellation.

2. **Indirect Loss:** Loss that is an indirect result of any act or "Occurrence" covered by this coverage including, but not limited to, loss resulting from:

   a. Your inability to recognize income that you would have realized had there been no loss of Covered Property.

   b. Payment of damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this policy.

   c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

3. **Legal Expenses:** Expenses related to any legal action.

**E. CONDITIONS:**

1. **Premiums:** The First Named Insured shown is responsible for the payment of all premiums; and will be the payee for any return premiums we pay.

2. **Two or More Plans:** If two or more plans are insured under this coverage, any payment we make for loss:

   a. Sustained by two or more Plans, or

   b. Commingled funds or other property of two or more Plans that arises out of one "Occurrence," is to be shared by each Plan sustaining loss in the proportion that the amount of coverage required for each such Plan under ERISA provisions bears to the total of those amounts.

3. **Duties in the Event of Loss:** After you discover a loss or a situation that may result in loss of Covered Property you must:

   a. Notify us as soon as possible.

   b. Submit to an examination under oath at our request and give us a signed statement of your answers.

   c. Give us a detailed, sworn proof of loss within 120 days.

   d. Cooperate with us in the investigation and settlement of any claim.

4. **Discovery Period for Loss:** We will pay only for covered loss discovered no later than one year from the end of the policy period.

5. **Legal Action Against Us:** Any Legal action brought against must be brought within 2 years from the date you discover the loss.

You may not bring any legal action against us involving loss unless:

   a. You have complied with all the terms of this coverage.

   b. 90 days have passed after you have filed proof of loss with us.

# NGM INSURANCE COMPANY

**EMPLOYEE THEFT COVERAGE IN COMPLIANCE WITH THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**
**POLICY NUMBER: F-834803**

6. **Loss Sustained During Prior Coverage:**

  a. If you, or any predecessor in interest, sustained loss during the period of any prior coverage that you or the predecessor in interest could have recovered under that coverage except that the time within which to discover loss had expired, we will pay for it under this policy, provided:

   i. This bond became effective at the time of cancellation or termination of the prior coverage; and

   ii. The loss would have been covered by this policy had it been in effect when the acts or events causing the loss were committed or occurred.

  b. The coverage under this Condition is part of, not in addition to, the Limits of Liability applying to this policy and is limited to the lesser of the amount recoverable under this policy as of its effective date or the prior coverage had it remained in effect.

7. **Loss Covered Under This Policy and Prior Coverage Issued by Us or Any Affiliate:** If any loss is covered partly by this policy or partly by any prior canceled or terminated coverage that we, or any affiliate, had issued to you or any predecessor in interest the most we will pay is the larger of the amount recoverable under this policy or the prior coverage.

8. **Non-Accumulation of Limit of Liability:** Regardless of the number of years this coverage remains in force or the number of premiums paid, the Limit of Liability does not accumulate from year-to-year or period-to-period.

9. **Other Insurance:** This policy does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity. However, this policy will not apply to the amount of loss that is more than the applicable Limit of Liability shown.

10. **Ownership of Property; Interests Covered:** The property covered under this policy is limited to property that you own or hold or for which you are legally liable. However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization.

11. **Policy Period:** The Policy Period is shown in Item 2 subject to the Loss Sustained During Prior Coverage condition; we will only pay for loss that you sustain through acts committed or events occurring during the Policy Period.

12. **Records:** You must keep records of all Covered Property so we can verify the amount of any loss.

13. **Recoveries:** Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this policy will be distributed as follows:

  a. To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Liability;

  b. Then to us, until we are reimbursed for the settlement made.

  Recoveries *do not* include any recovery –

  a. From insurance, suretyship, reinsurance, security, or indemnity taken for our benefit; or

  b. Of original securities after duplicates of them have been issued.

14. **Territory:** This policy covers only acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico, Canal Zone, or Canada.

15. **Transfer of Your Rights of Recovery Against Others:**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

16. **Valuation:** Subject to the Limit of Liability provision, we will pay for:

  a. Loss of "Money" but only up to and including its face value.

  b. Loss of "Securities" but only up to and including their face value on the day the loss was discovered. We may, at our option:

   i. Pay the value of such "Securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "Securities;" or

   ii. Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "Securities." However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the "Securities" at the close of business on the day the loss was discovered; or the Limit of Liability shown above.

17. **Cancellation of the Policy as an Entirety:**

  a. The first Named Insured shown may cancel this policy by mailing or delivering to us advance written notice of cancellation.

  b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   i. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   ii. 30 days before the effective date of cancellation if we cancel for any other reason.

  c. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

  d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

  e. If this policy is canceled we will send the first Named Insured any premium refund due.

  f. If notice is mailed proof of mailing will be sufficient proof of notice.

18. **Cancellation As to Any "Employee":** This coverage is canceled as to any "Employee":

  a. Immediately upon discovery by You or Any of your partners, officers or directors not in collusion with the "Employee" of any dishonest act committed by that "Employee" whether before or after becoming employed by you.

  b. On the date specified in a notice mailed to you. That date will be at least 30 days after the date of mailing. The mailing of notice to you at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

19. **Inflation Guard:** If, at the inception of this policy, you have a Limit of Liability that is equal or greater than that required under ERISA, we agree to automatically increase that Limit of Liability, to equal the amount required under ERISA at the time you discover a loss, subject to the Non-Accumulation of Liability (8. above), and further subject to a maximum of $500,000.

20. **Changes:** This policy contains all the agreements between you and us concerning the coverage afforded. The first Named Insured shown is authorized to make changes in the terms of this policy with our consent. The terms of this policy can be amended or waived only by endorsement issued by us and made part of this policy.

68-QQ-ERISA(7.1.2010)                    This is page Two of a Two page document.

68-QQ-ERISA-03

# EXHIBIT D

# ERISA DISHONESTY BOND

Edition of October 1, 2017

## NGM INSURANCE COMPANY
(Herein called Company)

**Policy No.**
F-834803

### DECLARATIONS

**Item 1.**   Name of Employee Benefit Plans (herein called Insured):

Amalgamated Local 427 and Allied Industries Health Welfare Fund

Principal Address:  155 Changebridge Road

Montville, NJ 07045

**Item 1a.** Plan Sponsor

Plan Sponsor Address:

---

**Item 2.**   Policy Period: from 12:01 a.m. on October 1, 2018        to 12:01 a.m. on        continuous
                                                    (MONTH, DAY, YEAR)                                    (MONTH, DAY, YEAR)

**Item 3.**   **INSURING AGREEMENT, LIMIT OF INSURANCE**

| | **Limit of Insurance Per Occurrence** | **Deductible Per Occurrence** |
|---|---|---|
| 1.   Fraud or Dishonesty | $500,000.00 | $0.00 |

---

**Item 4.**   **ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED**

68-QQ-9025 (Ed. 1.22.2018)

---

**Item 5.**   **CANCELLATION OF PRIOR INSURANCE**

By acceptance of this Policy you give us notice cancelling prior policy Nos.

Form Number  68-QQ-ERISA for Policy Number  F-834803

---

EXECUTED BY: _____
                        Nancy Giordano-Ramos, Vice President

COUNTERSIGNED BY: _____
                        Printed Name: Connie Lopez

Date: October 1, 2018

SP 00 03 10 17
Printed in U.S.A.                    Copyright, The Surety & Fidelity Association of America, 2017

| ERISA DISHONESTY BOND | Throughout this Policy the words "you" and "your" refer to the Insured(s) shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. Read the entire Policy carefully to determine rights, duties and what is or is not covered. Words and phrases defined in the Policy are in **bold** type. This Policy's coverage is limited to the acts of **covered persons,** as defined in Definition C.2. |
|---|---|
| **A. CONSIDERATION CLAUSE** | In return for the payment of the premium, and subject to the Declarations, Insuring Agreement, Definitions, Exclusions, Conditions and other terms of this Policy, we will pay for loss covered by the Insuring Agreement of this Policy that you sustain resulting directly from acts committed or events occurring at any time and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss, Condition E.8. |
| **B. INSURING AGREEMENT** | **Fraud or Dishonesty**<br>  We will pay for loss of **money, securities** or **other property** resulting directly from **fraud or dishonesty** committed by a **covered person**. |
| **C. DEFINITIONS** | 1. **Cash** means United States or Canadian bills and coins in current use and having a face value that are accepted by the United States or by the government of Canada as legal tender for the payment of debts.<br><br>2. **Covered person** means any natural person who is<br>    a. a trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any **employee benefit plan(s)** insured under this insurance; or<br>    b. a director, officer, employee or trustee of the Plan Sponsor, but only while that person is handling **money**, **securities** or **other property** of an **employee benefit plan** insured under this insurance;<br>but does not include any agent, broker, person leased to you by a labor leasing firm, factor, commission merchant, consignee, independent contractor or representative of the same general character.<br><br>3. **Cryptocurrency** means a digital or electronic medium of exchange, operating independently of a central bank, in which encryption techniques are used to regulate the generation of units and to verify the transfer of such units from one person to another.<br><br>4. **Employee benefit plan(s)** means any welfare or pension benefit plan listed in the Declarations as an Insured that is subject to the Employee Retirement Income Security Act of 1974 (ERISA), as amended.<br><br>5. **Fraud or dishonesty** means larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wrongful conversion or willful misapplication, or any other fraudulent or dishonest act, including acts prohibited by title 18, section 1954 of the U.S. Code.<br><br>6. **Money** means:<br>    a. **Cash**;<br>    b. Demand and savings deposits at financial institutions; and<br>    c. Travelers checks, register checks and money orders held for sale to the public.<br><br>7. **Occurrence** means all loss or losses caused by, or involving, any one **covered person**, acting alone or in collusion with others.<br><br>8. **Other property** means any tangible property other than **money** and **securities** that has intrinsic value but does not include any property excluded under this insurance.<br><br>9. **Securities** mean negotiable and nonnegotiable instruments or contracts representing either **money** or property and includes stocks, bonds, notes, repurchase agreements, commodities contracts and other instruments regularly bought and sold by broker dealers on stock or commodities exchanges, but does not include **money.** |

1

### D.  EXCLUSIONS

We will not pay for loss as specified below:

**1.  Acts Committed by You**

Loss resulting from any dishonest act committed by the Insured **employee benefit plan(s)** whether acting alone or in collusion with other persons. This exclusion does not affect coverage for loss under this Policy caused by the acts of **covered persons.**

**2.  Fire**

Loss from damage to the premises resulting from fire, however caused.

**3.  Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**4.  Indirect Loss**

Loss that is an indirect result of any act or **occurrence** covered by this Policy including, but not limited to, loss resulting from:

a.  Your inability to realize income that you would have realized had there been no loss;

b.  Payment of damages of any type for which you are legally liable unless you establish that the act or acts that gave rise to the damages involved conduct which caused a covered loss of **money, securities** or **other property** which was in your custody and control and for which you were responsible prior to the loss; or

c.  Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**5.  Legal Expenses**

Expenses related to any legal action.

**6.  Nuclear Chemical or Biological**

Loss resulting from nuclear reaction, nuclear radiation or radioactive, chemical or biological contamination, or any related act or incident.

**7.  War and Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

**8.  Prior Dishonesty**

Loss resulting from the dishonest or fraudulent acts of a **covered person** if you, or any employee, trustee, fiduciary or plan administrator of the Plan Sponsor or an Insured **employee benefit plan** who is not in collusion with such **covered person,** knows or knew prior to such loss of any prior dishonest or fraudulent act committed by such person, whether in the employment of the Plan Sponsor or any Insured **employee benefit plan** or otherwise, whether or not of the type covered under this Policy and without regard to whether the knowledge was obtained before or after the commencement of this Policy.

**9. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

a.  An inventory computation; or

b.  A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records to support the amount of loss claimed.

**10. Cryptocurrency**

Loss resulting from the theft, disappearance or destruction of **cryptocurrency** or from the change in value of **cryptocurrency.**

**11. Negligence**

Loss resulting from the negligence of a **covered person**.

**12. Confidential Information**

Loss resulting from the theft, disappearance, destruction or disclosure of confidential information including, but not limited to, trade secrets, personal information, personally identifiable information, customer lists and intellectual property; provided however that this exclusion will not apply to loss that is otherwise covered under this Policy, caused by a **covered person's** access to, use of, or disclosure of confidential information to commit acts of **fraud or dishonesty**.

**13. Data Breach Costs**

Expenses related to your obligations to comply with federal and state privacy laws and Payment Card Industry Data Security Standards (if applicable) arising from a data security breach, including, but not limited to, expenses related to notifying affected individuals when the affected individuals' personally identifiable financial or medical information was stolen, accessed, downloaded or misappropriated while in your care, custody or control, forensic audit expenses and fines and penalties.

---

**E.  CONDITIONS**

**1.  Cancellation**

a.  The Plan Sponsor shown in the Declarations may cancel this Policy by mailing or delivering to us advance written notice of cancellation.

b.  We may cancel this Policy by mailing or delivering to the Plan Sponsor written notice of cancellation at least:

(1)  10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2)  30 days before the effective date of cancellation if we cancel for any other reason.

c.  We will mail or deliver our notice to the Plan Sponsor's last mailing address known to us.

d.  Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

e.  If this Policy is canceled, we will send the Plan Sponsor any premium refund due. If we cancel, the refund will be pro rata. If the Plan Sponsor cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

f.  If notice is mailed, proof of mailing will be sufficient proof of notice.

**2.  Changes**

This Policy contains all the agreements between you and us concerning the insurance afforded. The Plan Sponsor shown in the Declarations is authorized on behalf of all insureds to agree with us on changes in the terms of this Policy. If the terms are changed, the changes will be shown in an endorsement issued by us and made a part of this Policy.

**3.  Concealment, Misrepresentation or Fraud**

This Policy is void in any case of fraud by you as it relates to this Policy at any time. It is also void if any Insured or the Plan Sponsor, at any time, intentionally conceals or misrepresents a material fact concerning:

a.  This insurance;

b.  The covered property;

c.  Your interest in the covered property; or

d.  A claim under this insurance.

4. **Consolidation and Merger**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity any additional persons become **covered persons**:

a. The Plan Sponsor must give us written notice and obtain our written consent to extend this Policy to such additional **covered persons**. We may condition our consent upon payment of an additional premium; but

b. For the first 60 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, any insurance afforded for **covered persons** also applies to these additional **covered persons** for acts committed or events occurring within said 60 day period.

5. **Discovery of Loss**

Discovery of loss occurs when you or the Plan Sponsor first become aware of facts which would cause a reasonable person to assume that a loss covered by this Policy has been or will be incurred, even though the exact amount or details of the loss may not then be known. Discovery also occurs when you or the Plan Sponsor receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this insurance.

6. **Duties in the Event of Loss**

After you or the Plan Sponsor discover a loss or a situation that may result in a loss you or the Plan Sponsor must:

a. Notify us as soon as possible;

b. Submit to examination under oath at our request and give us a signed statement of your answers;

c. Give us a detailed, sworn proof of loss within 120 days; and

d. Cooperate with us in the investigation and settlement of any claim.

7. **Employee Benefit Plan(s)**

a. It is the responsibility of you or the Plan Sponsor to select a Limit of Insurance for the Insuring Agreement that is sufficient to provide a limit that is at least equal to that required under ERISA if each **employee benefit plan** were separately insured.

b. Any payment we make to the Plan Sponsor for loss sustained by any **employee benefit plan** will be held by the Plan Sponsor for the use and benefit of the plan(s) sustaining the loss.

c. If two or more **employee benefit plans** are insured under this insurance, any payment we make for loss:

(1) Sustained by two or more **employee benefit plans**; or

(2) Of commingled **money, securities** or **other property** of two or more **employee benefit plans**;

that arises out of one **occurrence** and cannot be allocated specifically to any one **employee benefit plan**, is to be shared by each **employee benefit plan** sustaining loss in the proportion that the limit of insurance required under ERISA for each such **employee benefit plan** bears to the total of those limits.

8. **Extended Period to Discover Loss**

a. We will pay for loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you within one year following the date of termination or cancellation.

b. However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you that offers the same coverage afforded by this Policy in an amount no less than the minimum amount required under ERISA section 412 and provides coverage for loss sustained prior to its effective date.

9. **Joint Insured**

4

a.  The Plan Sponsor shown in the Declarations is responsible for the payment of all premiums and will be the payee for any return premiums we pay.

b.  If more than one Insured is named in the Declarations, the Plan Sponsor may act for itself and for every other Insured for all purposes related to this insurance.

c.  If the Plan Sponsor, any Insured or fiduciary of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

d.  If this Policy or any of its coverage is canceled or terminated as to any Insured, Condition E.8. Extended Period to Discover Loss applies separately to that Insured.

**10. Legal Action Against Us**

You may not bring any legal action against us involving loss:

a.  Unless you and the Plan Sponsor have complied with all the terms of this Policy; and

b.  Until 90 days after you or the Plan Sponsor have filed proof of loss with us; and

c.  Unless brought within 2 years from the date you or the Plan Sponsor discover the loss.

**11. Liberalization**

If we adopt any revision that would broaden the coverage under this Policy without additional premium within 45 days prior to or during the Policy Period, the broadened coverage will immediately apply to this insurance.

**12. Limit of Insurance**

The most we will pay for loss in any one **occurrence** is the Limit of Insurance shown in the Declarations.

**13. Non-Cumulation of Limit of Insurance**

Regardless of the number of years this Policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or Policy Period to Policy Period.

**14. Other Insurance**

This Policy does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this Policy will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity.

**15. Ownership of Property, Interests Covered**

The property covered under this Policy is limited to property:

a.  That you own or hold; or

b.  That is owned and held by someone else under circumstances that made you responsible for the property prior to, and independent of, the loss.

However, this Policy is for your benefit only. It provides no rights or benefits to any other person or organization.

**16. Records**

You must keep records of all covered property so we can verify the amount of any loss.

**17. Recoveries**

a.  Recoveries, whether effected by you or us, shall be applied, net of the expense of such recovery, in the following manner and order:

(1)  To the satisfaction of your loss which would otherwise have been paid under this Policy but for the fact that it is in excess of the Limit of Insurance;

(2)  Then to us, until we are reimbursed for the settlement made;

(3)  Then to you for any loss not covered by this Policy.

b.  Recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for our benefit.

c.  If original securities are recovered after duplicates of such securities have been issued, the original securities shall be surrendered to us.

**18. Territory**

This Policy covers only acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico or Canada. In addition, we will pay for loss caused by any **covered person** while temporarily outside of said territories for a period of not more than 90 days.

**19. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without our written consent.

**20. Transfer of Your Rights of Recovery Against Others to Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You also must do everything necessary to secure those rights and do nothing after loss to impair our actual or potential rights of recovery.

**21. Valuation — Settlement**

a. Subject to the Limit of Insurance provision we will pay for:

(1) Loss of **money** but only up to and including its face value. We may, at our option, pay for loss of **money** issued by any country other than the United States of America:

(i) At face value in the **money** issued by that country; or

(ii) In the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.

(2) Loss of **securities** but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

(i) Pay the value of such **securities**, or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those **securities**; or

(ii) Pay the cost of any lost securities bond required in connection with issuing duplicates of the **securities**. However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(a) Value of the **securities** at the close of business on the day the loss was discovered; or

(b) Limit of Insurance.

(3) Loss of, or loss from damage to **other property**. However, we will not pay more than the least of the following:

(i) The Limit of Insurance applicable to the lost or damaged property;

(ii) The cost to replace the lost or damaged property with property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(4) We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property actually is repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

b. We may, at our option, pay for loss of, or loss from damage to, property other than **money**:

(1) In the **money** of the country in which the loss occurred; or

6

(2) In the United States of America dollar equivalent of the **money** of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

c.   Any property that we pay for or replace becomes our property.

**22. Cancellation as to Any Covered Person**

Coverage under this Policy is canceled as to any **covered person**:

a.   Immediately upon discovery by any Insured **employee benefit plan**, or by any employee, trustee, fiduciary or plan administrator of such an Insured **employee benefit plan** or Plan Sponsor who is not in collusion with the **covered person**, of any dishonest act committed by that **covered person** whether before or after becoming a **covered person**. Whether such discovery occurs prior to or after commencement of this Policy, there is no coverage under the Insuring Agreement for loss or losses resulting from acts committed by that **covered person** after the date of such discovery.

b.   On the date specified in a notice mailed to you. That date will be at least 30 days after the date of mailing. The mailing of notice to you at the last mailing address of the Plan Sponsor known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

**23. Deductible**

The deductible set forth in the Declarations shall be applicable to a loss suffered by an **employee benefit plan** only after that **employee benefit plan** has received from us: a.   $500,000; or

b.   $1,000,000, if the **employee benefit plan** holds "employer securities" within the meaning of section 407(d)(1) of ERISA.

---

IN WITNESS WHEREOF, we have caused this Policy to be executed on the Declarations page.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ERISA AMENDATORY ENDORSEMENT

This endorsement modifies ERISA DISHONESTY BOND Policy No. F-834803

**Item 2.** is further amended as follows:

Policy Period end date is deleted and the policy period shall be continuous until cancelled according to the provisions of
E. CONDITIONS 1. Cancellation, or as modified by endorsement.

**Item 3. INSURING AGREEMENT, LIMIT OF INSURANCE** is amended as follows:

2. If, at the inception of this Policy, you have a Limit of Insurance Per Occurrence that is equal to or greater than that required under the Employee Retirement Income Security Act of 1974 (ERISA), we agree to automatically increase that Limit of Insurance Per Occurrence to equal the amount required under ERISA at the time you discover a loss, subject to:

    a.      Section E. CONDITIONS, ITEM 13.  Non-Cumulation of Limit of Insurance, and
    b.      A maximum of $500,000.

End of Endorsement

NGM Insurance Company

68-QQ-9025 (Ed.1.22.2018)